In re Ulpiano UNANUE–CASAL a/k/a
Charles Unanue, Debtor.

GOYA FOODS, INC.; Goya De Puerto
Rico, Inc.; Zolmar Realty Corp.; Inter-
americas Advertising; Island Can Cor-
poration; Tradewinds Foods, Inc.; In-
ter–Americas Advertising Corp.; CPR
International, Inc.; CPR International
Limited; Condimentos De Puerto Rico,
Inc.; Industrial Enterprises, Inc.; Jo-
seph A. Unanue; Frank Unanue, Appel-
lants,

v.

Ulpiano UNANUE–CASAL, a/k/a Charles
Unanue, Debtor, and Gerardo Quiros–
Lopez, Chapter 7 Trustee, Respondents.

Civ. No. 92–1796 GG.
Bankruptcy No. 90–04490 (SEK).
Adv. No. 91–0099.

United States District Court,
D. Puerto Rico.

Aug. 3, 1993.

Michael R. Griffinger, Newark, NJ, Guillermo A. Nigaglioni, Hato Rey, PR, for appellants (Beneficiaries).

Jose Gonzalez–Irizarry, Samuel Cespedes, Arturo Garcia–Sola, Dora Penagaricano, San Juan, PR, for Goya Foods, Inc.

Jan Brody, Roseland, NJ, Antonio Hernandez, William Vidal, San Juan, PR, Alejandro Oliveras, U.S. Trustee's Office, Hato Rey, PR, Gerardo A. Quiros, Trustee, Santurce, PR, for debtor.

## OPINION AND ORDER

GIERBOLINI, Chief Judge.

The Appellants' petition this court to reverse the bankruptcy court's refusal to lift the automatic stay of proceedings in the New Jersey Superior Court. The Appellee (Debtor) filed a bankruptcy petition under Chapter 7 on August 29, 1990, after litigating for almost three years in the New Jersey Superior Court. In its May 15, 1992, Opinion and Order the bankruptcy court denied relief from stay; it found the Appellant had not presented evidence of "cause" to lift the stay. We hold that the bankruptcy court erred when it found that the Appellant had not presented evidence of "cause", and thus abused its discretion when it denied relief from the stay. We, therefore, reverse the bankruptcy court's order and relief from the stay is granted.

## BACKGROUND

In 1908, an ambitious and young Prudencio Unanue, like Juan el Indiano in the Zarzuela "Los Gavilanes" [1], came to this country from Spain with the intention of making himself rich. In this quest he eventually founded and organized the largest manufacturer of Hispanic foods—GOYA. Don Prudencio could not have anticipated the struggle that would ensue for the wealth he created, this conflict set brother against brother and launched a historic series of litigations between them, lasting more than twenty years. After two decades of this legal warfare, with numerous cases filed by them in different jurisdictions, and after an abundance of heavy submissions, all supported by deep pockets on both sides of the controversies, we believe that if left to their natural proclivities the brothers' private war may surpass the record attained by the 100 Years War (actually 116).[2] It is through this odyssey of

---

1. A Zarzuela is a Spanish musical, in which the performers both sing and speak.

2. We are referring, of course, to the war between France and England lasting from 1337 to 1453. The conflict's turning point was Joan of Arc's victorious rallying of the French to expel the English from France. Unfortunately, she

trials that we are introduced into the lives of the Unanue's and their warring sons.

Don Prudencio and his wife, doña Carolina, were married in Puerto Rico on November 4, 1921; don Prudencio was domiciled in New York and doña Carolina was domiciled in San Lorenzo, Puerto Rico. They had four sons: Charles (or Ulpiano, the Debtor, and first born), Joseph, Anthony (deceased) and Frank Unanue. Soon after their marriage, don Prudencio returned to New York where doña Carolina joined him in 1923. By 1929, the Unanue's had moved to New Jersey where they would live and work until 1970.

On November 16, 1970, don Prudencio executed his last will and testament and a revocable *inter vivos* trust in New York. The trust held don Prudencio's 53 shares of voting stock for the grandchildren, who would receive their share of the corpus at a specified age.

Don Prudencio left for Puerto Rico in November, 1970, as he did habitually to avoid the effect of the winters on his arthritic body. He was never to return to New Jersey again because he suffered a stroke and was beset with a series of maladies, which sapped his vitality, until he died in 1976. Doña Carolina died in 1984, and her sister Ana María in 1985.

After don Prudencio's death, the Trustees (Joseph and Frank Unanue) probated, administered and distributed his will. In 1986, the Superior Court in New Jersey approved a First Accounting filed by the trustees, and contested by C. Jeffrey Unanue, one of Charles' sons. At that time, several of the Beneficiaries received their share of the trust, in accordance with the trust's provisions. *See Unanue Casal v. Unanue Casal*, 132 F.R.D. 146, 148 (D.N.J. 1989).

In 1969, prior to don Prudencio's death, a dispute arose between Charles (Debtor), and his brothers (Appellants). As a result of this confrontation Charles held a press conference in New York to expose and distance himself from an alleged tax evasion scheme his brothers had involved the companies in. Don Prudencio felt betrayed by Charles' actions, which humiliated the family and exposed their enterprises to tax penalties. Don Prudencio subsequently allied himself with his other sons against Charles.

From this time on, Charles has claimed that he was a victim of his brothers' conspiracy against him, but it was later determined from the testimony before Judge Kole of the New Jersey Superior Court that it was Charles' behavior that turned his brothers Joseph and Frank against him.[3] This dispute was temporarily settled on June 9, 1972, with the execution of the 1972 Agreement. Under this agreement Charles' voting shares in GOYA and the other affiliated companies were bought back for $4.5 million.

In 1973, Charles claimed the other parties to the Agreement had breached the 1972 Agreement. This embroglio was temporarily resolved by the 1974 Amendment to the 1972 Agreement, signed July 31, 1974. The 1974 Amendment, which included additional parties not in the first Agreement, was aimed at excluding Charles from don Prudencio's will and trust, and effectively exiling Charles from the family enterprises. In turn, Charles secured and accelerated the transfer of $4,300,000. in compensation. He also "promised never to bring any claim or suit ..., contesting or objecting to don Prudencio's will or trust", and not to interfere with the disposition of assets of stock by don Prudencio, his estate, the beneficiaries or his brothers.[4] The Amendment also specified that any signatory who loses a suit "concerning any matter" with another signatory has to pay the winner liquidated damages of double

---

was later captured, found guilty of heresy and burned alive by the English.

**3.** Judge Kole's Op., Dec. 4, 1991; R. on Appeal, Volume VI, # 53, at 106.

**4.** *Id.* at 109–110.

costs and attorney's fees.[5]

In July 1987, eleven years after his father's death, Charles demanded from Joseph and Frank Unanue his share of the estates of don Prudencio, doña Carolina and Ana María (Carolina's sister). On August 13, 1987, Joseph and Frank, as trustees of the 1970 trust, sued Charles, in the Superior Court of New Jersey—Probate part. They were seeking a declaratory judgment barring Charles from maintaining any claims against don Prudencio's estate and the *inter vivos* trust. Charles responded by filing an amended counterclaim on June 17, 1988, claiming the 1972 Agreement and the 1974 Amendment were invalid. In addition, he claimed a share of the trust, based upon his thesis that because his parents were married in Puerto Rico, then the trust was subjected to the conjugal partnership laws of this Commonwealth.

On August 30, 1988, Charles filed a claim in the Superior Court of Puerto Rico requesting that the 1972 Agreement and the 1974 Amendment be rescinded. This claim was consolidated with a previous 1987 action in the Superior Court of Puerto Rico seeking an inheritance from don Prudencio's, doña Carolina's and Ana María's estate. Finally, Charles filed a bankruptcy petition under Chapter 7 on August 29, 1990, in the District of Puerto Rico—nine days before the close of the trial in New Jersey. The New Jersey proceedings were stayed contemporaneously to the filing of this Bankruptcy petition.[6]

On February 6, 1991, the bankruptcy court held the first hearing on relief from the automatic stay. In its subsequent oral Opinion of February 8, 1991, the bankruptcy court modified the stay and denied Appellants complete relief from the stay. The modification was to allow the New Jersey court to continue with its determination of don Prudencio's domicile at the time he executed his trust agreement—November 16, 1970—and at his death in Puerto Rico on March 17, 1976. When it modified the stay, the bankruptcy court explained that the Appellants may never have to come to this court if the New Jersey tribunal decides domicile was in New Jersey.[7]

Judge Kole of the New Jersey Superior Court decided on December 4, 1991, *after 171 days of trial,* that don Prudencio was domiciled in New Jersey on the dates in controversy. Appellants, then, filed a second motion for further relief from the stay of the New Jersey proceeding. The bankruptcy court in its May 15, 1992, Opinion again denied relief from the stay, this time because it found the appellant failed to present evidence of "cause" to do so. We heard the arguments on appeal, and requested supplementary briefing from the parties on the issue of "for cause".

## STANDARD OF REVIEW

■ We now address the standards of review that we must apply to the decision of the bankruptcy court. Findings of facts are reviewed under the clearly erroneous standard. *In Re Kerns,* 111 B.R. 777, 781 (S.D.Ind.1990), *citing In Re Excalibur Auto Corp.,* 859 F.2d 454, 457, n. 3 (7th Cir.1988). "Clearly erroneous" is interpreted to mean that a reviewing court can upset a finding of fact, even if there is evidence to support the finding, only if the court is left with "the definite and firm conviction that a mistake has been committed." *U.S. v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Graham v. Lennington,* 74 B.R. 963, 965 (S.D.Ind.1987).

■ "Ultimate facts", or mixed questions of fact and law, are also tested in the First Circuit under the "clearly erroneous" standard. *U.S. v. Cochrane,* 896 F.2d 635, 639 (1st Cir.1990). The reviewing court may, however, "look carefully" to discover

---

5. Mot. for Relief from Stay, Nov. 6, 1990; R. on Appeal, Vol. I, # 2, at 9. *See also,* 1974 Amendment, Article VIII, Section 8.01; R. on Appeal Vol. V–A, # 2, at 45.

6. *See* 11 U.S.C. § 362(a): "Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ... operates as a stay....."

7. Op. & Order Den. Mot. to Lift Stay at 8, 11. 11–14.

if the court based its findings upon incorrect legal principles. *Id.; See also Sweeney v. Board of Trustees*, 604 F.2d 106, 109 (1st Cir.1979). "If the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, n. 15, 102 S.Ct. 2182, 2189, n. 15, 72 L.Ed.2d 606 (1982). The bankruptcy court's conclusion on the issue of cause is such an ultimate fact. *Kerns*, 111 B.R. at 782 ("The question of whether "cause" has been shown ... does not appear to be one of unfettered discretion. Rather this would seem to be a mixed question of law and fact to be resolved based on the evidence produced by the parties, and guided by the exercise of the court's discretion.").

Most appeals from bankruptcy courts' decisions on relief from stay have reviewed the trial court for an abuse of discretion. *In re Holtkamp*, 669 F.2d 505, 507 (7th Cir.1982). However, as *Kerns*, 111 B.R. at 782, points out from its reading of § 362(d): "a review of the actual statutory language suggests that the matter may not be one of total discretion." [8] Section 362(d) directs the court to grant relief from the stay for cause by using the word "shall." *Id.* "Thus, where cause is found to exist, the courts have no discretion to deny relief." *Id.*

■■■ *Kerns* concludes its analysis by proposing a 3–pronged standard, which we adopt:

"(1) The question of whether cause exists is a separate inquiry dependent upon the facts as adduced at the hearing and guided by the trial court's discretion; (2) that where cause does exist, relief must be granted; (3) and that, in fashioning the

grant of relief, the trial court has full discretion." *Id.* As in *Kerns*, we have not modified prior law, but hopefully merely made it clearer.

· It seems to us that the court below based its decision upon an incomplete version of the burden of proof standard and the law of "for cause". *See infra.* Therefore, with due deference, we find the bankruptcy court did not exercise its discretion reasonably in guiding the inquiry on the question of cause, and when it subsequently denied relief from the stay once cause was established.

## BURDEN OF PROOF

Section 362(g) allocates the burden of proof in motions seeking relief from stay. It provides as follows:

"(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtors equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues." 11 U.S.C. § 362(g).

■■■ Most cases have interpreted the same section as requiring that the party moving for relief must meet the "initial burden to come forward with [prima facie] evidence showing that cause existed." [9] *In Re Unioil*, 54 B.R. 192, 194 (Bankr.D.Colo. 1985). Accordingly, it is necessary to clarify the concept of "prima facie" evidence. Prima facie evidence is "evidence which suffices for the proof of a particular fact until contradicted and overcome by other evidence. An inference or presumption of, affirmative or negative of a fact, in the absence of proof or until proof can be

---

**8.** 11 U.S.C. § 362(d):

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> (A) the debtor does not have equity in such property; and
> (B) such property is not necessary to an effective reorganization.

**9.** *See* Op. & Order, May 15, 1992, at 10, 11. 16–26.

obtained or produced to overcome the inference." *Blacks Law Dictionary* p. 1071 (5th Ed.1979). *See also In Re Planned Systems, Inc.*, 78 B.R. 852, 860 (Bankr. S.D.Ohio 1987); *In Re Stranahan Gear Co.*, 67 B.R. 834, 836 (Bankr.E.D.Pa.1986). With the above in mind, we find that Appellants' arguments referred to sufficient evidence to meet a "prima facie" burden of proof. If the above analysis was not employed, it explains why the court below declined to find cause.

■ The weight of authority explains that once the moving party establishes cause for such relief, a [stricter] burden then shifts to the debtor to demonstrate that he is entitled to the stay. *Unioil*, 54 B.R. at 194; *See also In Re Setzer*, 47 B.R. 340, 345 (B.C.E.D.N.Y.1985); *Accord*, 2 Collier on Bankruptcy, ¶ 362.10 (1988) (the Code requires a showing of cause by the movant under § 362(d)(1), and then § 362(g) places a burden of proof or "risk of non-persuasion" on the party opposing relief.).

The Debtor's evidence was not mentioned by the court below, presumably because it had decided the Appellants had not met their burden. This was clear error.

## THE LAW OF "FOR CAUSE"

Most cases have acknowledged that the term "cause" is not defined in the statute. Thus, some cases have turned to the legislative intent to determine the meaning of § 362(d)(1). *Kerns* 111 B.R. at 786; *See also In Re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2nd Cir.1990).

■ The most express guidance is that cause can include the lack of adequate protection of an interest in property. *Supra*, n. 5. Additional scenarios put forth by Congress are a "lack of any connection with or interference with the pending bankruptcy case ... proceedings in which the debtor is a fiduciary, or involving post-petition activities of the debtor ... because they bear no relationship to the purpose of the automatic stay, which is protection of the debtor and his estate from his creditor." *Sonnax*, 907 F.2d at 1286, *quoting* S.Rep. No. 989, 95th Cong., 2d Sess. 52,

*reprinted* in 1978 U.S.Code Cong. & Admin.News 5787, 5838. The policy propelling the law of the automatic stay is "to give the debtor a breathing spell from his creditors." *Kerns*, 111 B.R. at 788, *quoting* S.Rep. No. 95–989, *reprinted*, in 1978 U.S.Code Cong. & Admin.News 5840. *See also In re Pro Football Weekly Inc.*, 60 B.R. 824, 826 (N.D.Ill.1986) ("It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties in their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.").

■ *In Re Curtis*, 40 B.R. 795, 799–800 (Bankr.D.Utah 1984), summarized the jurisprudence, and found [12] factors courts considered when they determined if the stay should be lifted, or continued. They are the following: (1) whether the relief will result in a partial or complete resolution of the issues; (2) the lack of any connection with or interference with the bankruptcy case; (3) whether the foreign proceeding involves the debtor as fiduciary; (4) whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases; (5) whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation; (6) whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question; (7) whether litigation in another forum would prejudice the interest of other creditors, the creditors' committee and other interested parties; (8) whether the judgment claim arising from the foreign action is subject to equitable subordination under section 510(c); (9) whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor; (10) the interest of judicial economy and the expeditious and economical determination of litigation for the parties; (11) whether the foreign proceedings have progressed to the point where the parties are prepared for

trial; (12) the impact of the stay on the parties and the "balance of hurt". *Id.*

Some courts have also considered the misconduct of the debtor or dilatory "forum shopping" tactics in deciding whether to lift the stay. *In re Laventhol & Horwath*, 139 B.R. 109, 117 (S.D.N.Y.1992); *In re Hohol*, 141 B.R. 293, 299 (M.D.Pa.1992); *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1026–27 (11th Cir.1989); *In re Tucson Estates*, 912 F.2d 1162, 1169 (9th Cir. 1990); *In Re Highcrest Management Co.*, 30 B.R. 776, 779 (B.C.S.D.N.Y.1983).

Finally, in *Pro Football Weekly, Inc.*, 60 B.R. at 824, the court considered as part of its 3–pronged test to lift the stay, whether the creditor has a probability of prevailing on the merits of his case.

The moving party—appellant—need not prove a plurality of *Curtis* factors or any other factors before it has shown cause existed for lifting the stay. Generally, courts have relied on only a few factors, and one court has used only one non-*Curtis* factor, to determine that sufficient cause existed to lift the stay. *See, e.g., Unioil*, 54 B.R. at 194–95. (court considered five factors such as resolution of the issues, lack of connection with the bankruptcy case, judicial economy and balance of hurt). *See also Highcrest Management Co.*, 30 B.R. at 778–779 (court considered only the debtor's misconduct, without any *Curtis* factors). *Broadhurst. v. Steamtronics Corp.*, 48 B.R. 801, 802–803 (D.Conn.1985) (The court considered the expected prompt resolution of the state court proceeding, a showing of no prejudice to the debtor, and the presence of state law issues, which would not interfere with the bankruptcy case).

■ The bankruptcy court correctly stated that "the question of what is cause ... is developed primarily by case law." [10] We agree, and turn now to consider the *Curtis* factors in this case, as well as any

of the other factors that apply, to determine if the Appellants met their burden of presenting [prima facie] evidence of cause.

## A. *Judicial economy*

The Appellants argue that judicial economy would be best served by concluding the New Jersey proceedings. More specifically, the Appellants claim that the New Jersey proceeding has "sufficiently advanced" to a point that it would be a waste of judicial resources to begin proceedings on the "remaining issues" before another court.

Appellants want us to determine that Judge Kole's decision on domicile was part of the "unitary action" to resolve the inheritance conflict between the Unanue brothers and thereafter distribute the trust. In other words, the issue of domicile should not be divorced substantively from the other issues pending in New Jersey. In support, they aver that Judge Kole's decision on domicile progressed beyond the issue of domicile into other areas that would be conducive to the resolution of the "remaining issues." Thus, they ask this court to reserve the scant resources of the judiciary, both here in bankruptcy court and in New Jersey, by lifting the stay, and allowing the New Jersey proceedings to continue to resolution in a quicker and more orderly manner.[11] Finally, they argue that only the New Jersey court has the expertise to deal with state law issues of probate law. We agree with Appellants.

We now turn to determine if Appellants met their burden of a "prima facie" showing of cause. In its "oral" Opinion of February 8, 1991, subsumed in the subsequent written Opinion of May 15, 1992, the bankruptcy court allowed the stay to be modified for the New Jersey court to determine don Prudencio's domicile.[12] The bankruptcy court remarked, correctly I think, that if the New Jersey court finds don Prudencio's domicile was in New Jer-

---

10. Op. & Order, May 15, 1992, at 11, 11. 8–10.

11. Appellants also argue that the court should abstain from deciding the "remaining issues". We will not address the abstention argument here since this is issue is before Judge Cerezo on

appeal. *See In re Ulpiano Unanue–Casal,* Civ. No. 92–2909(CC).

12. Op. & Order, Feb. 8, 1991, at 12, 11. 14–15.

sey, then "you [Appellants] may never have to come here" and "that may be the end of that".[13] Without further articulation or clarification, this remark can be taken to mean that the court believed the proceedings in New Jersey should continue if don Prudencio's domicile was found to be there. This is precisely why Judge Kole was assigned to decide the issue of domicile. Notwithstanding, the bankruptcy court denied further relief and maintained the stay in effect. On this point, our reasoning parts company with the court below.

The bankruptcy court discerned a separation between the issue of domicile, and Charles' claims. Under this imposed dichotomy, the issue of domicile is perceived as a separate and distinct issue from the rest of the claims before the New Jersey court. This separation of the issues is a legal determination permitting plenary review. We find that this legal determination was erroneous, and that the finding of domicile should not have been divorced from the "remaining issues". Therefore, we find that the litigation in New Jersey will conserve the limited judicial resources in the bankruptcy court.

We explain. The determination of don Prudencio's domicile is fundamental to Charles' claims before the New Jersey court. The purpose of resolving the domicile issue was to determine if Charles had a feasible claim to challenge the trust. Accordingly, this finding of domicile permitted the New Jersey court to determine what law would be applied to the dispute, and thus whether Puerto Rico or New Jersey would be the better forum. In fact, this is the reason the Superior Court in Puerto Rico also stayed its proceedings.[14] Therefore, once domicile was adjudged to be in New Jersey, then the most reasonable deduction is that the New Jersey court should continue to resolve this dispute.

The bankruptcy court also found the Appellant's argument, that the New Jersey court went further than the issue of domi-

cile and thus contributed to the resolution of the "remaining issues", to be without merit. In our review, we found that Judge Kole only slightly deviated from the issue of domicile when he entertained testimony from Charles about an alleged conspiracy to remove him from the corporation and disinherit him. We agree with the bankruptcy court on this factual finding only, but not with its conclusion.

If we were to approach this analysis from the bankruptcy court's perspective, that the issue of domicile is a separate event from the New Jersey proceedings, then it would be easy to understand why the bankruptcy court arrived at its conclusion. However, since we disagree with the court's dissection of the New Jersey proceeding, once domicile was found to be there, we find that Judge Kole's undertaking does contribute to the New Jersey proceeding. Furthermore, even if we accept the premise that the discovery surrounding the issue of domicile will not exactly duplicate the discovery on the remaining issues, we cannot disregard the reasonable inference, asserted by Appellants, that the New Jersey court's trial on the domicile issue has given that jurisdiction an advanced preparation to resolve this dispute. For example, Judge Kole, after [171] days of trial, assessed the credibility of witnesses, and heard testimony on the circumstances encompassing the trust, as well as the detailed chronicles of the family's histories and rivalries. We believe the bankruptcy court understood this when it expressed that the discovery elicited in New Jersey can be used in any appropriate forum.[15] The bankruptcy court stated that no discovery has been initiated on the remaining issues, but this, in our view, is the product of the stay which has been in effect for three years.

We are persuaded that the New Jersey court advanced the resolution of the case, regardless of the fact that the court only slightly diverged from the issue of domi-

---

**13.** *Id.* at 8, 11. 12–13.

**14.** Resolution of Judge Wilfredo Alicea, March 8, 1989; R. on Appeal, Volume VI, Ex. 10.

**15.** Op. & Order May 15, 1992, at 17–18.

cile. Therefore, continuing this case in New Jersey would serve the interests of preserving judicial resources.

Finally, the Appellants' claim that New Jersey is a more suitable forum because the issues before the New Jersey state court are mostly state law probate matters. However, the bankruptcy court ruled that Appellants did not present any evidence to show the New Jersey court had any special advantage or familiarity with the issues raised by Charles.[16]

That point is not well taken. The New Jersey court examined the family's history from the date don Prudencio arrived in the United States to don Prudencio's death in 1976. In addition the New Jersey Court is fully acquainted with the whole situation. It spent [171] days in trial, with [32] witnesses and [600] exhibits marked into evidence.[17] Finally, it seems to us incontrovertible that a State court has more expertise and is more familiar with its own probate and contract laws than a Federal bankruptcy court. *Cf. In re White*, 851 F.2d 170, 173–174 (6th Cir.1988) (lifting of stay affirmed because family law matters are state law issues best left to the State courts to resolve). It should be noted that the New Jersey Superior court already administered and distributed don Prudencio's will and part of the Trust. *Unanue Casal*, 132 F.R.D. at 148.

Several courts have found sufficient cause to lift a stay upon similar facts. In *Pursifull v. Eakin*, 814 F.2d 1501, 1506 (10th Cir.1987), the court of appeals found that there was sufficient cause for lifting of the stay based upon the trial court's determination that the state court proceeding was related to property located in the state, and thus a state issue which would be best decided by the state court. The state claim was filed about two and half months before the bankruptcy petition. In *In re Brown*, 951 F.2d 564, 570 (3rd Cir. 1991), the court found that the stay should

have been lifted on all issues, including issues not yet resolved by the state court, because the state court was familiar with the background of the case, and had explored some of the facets that bear on the remaining issues of foreclosure. The state court had decided a summary judgment motion on the issue of foreclosure, but had not made a decision on the losing party's claim that the bank had not adequately accounted for the proceeds of a liquidation sale. *Id.* at 570. The court also relied on the following policy statement: "we [cannot] overlook the importance of the flood of litigation pouring in on the bankruptcy courts, a development that requires that they carefully husband their resources." *Id.* at 570. *See also In re Saunders*, 103 B.R. 298, 299 (B.C.N.D.Fl.1989) (The court allowed the stay to be lifted on the state proceeding that had begun almost two years before the filing of the bankruptcy petition. The court also found that judicial economy was served because the court "could perceive no rationale for curtailing" the efforts of two years in court only for the court to retrace the same path.)

Don Prudencio's estate and trust, which expressly state that they are governed by New Jersey law, have been administered in New Jersey, where all of his assets are based. In addition, the New Jersey proceeding has been .pending for five years, and was stayed in part for two of those five years awaiting the resolution of don Prudencio's domicile. We are at a loss to understand why the bankruptcy court allowed the stay to be lifted in the first place for one issue only—domicile—and then denied relief on the other claims after domicile was decided in favor of New Jersey.

Therefore, we find that the issue of domicile was a key determination in the New Jersey proceeding, which has significantly advanced that proceeding so that in the interests of judicial economy it should be allowed to continue, and the stay subsequently lifted.[18]

---

**16.** *Id.* at 15, 11. 9–19.

**17.** Mot. for Relief from Stay, Nov. 6, 1990; R. on Appeal, Vol. I, Ex. 2, at 11.

**18.** It is not necessary to discuss another *Curtis* factor which applies to this case. Namely, whether the New Jersey proceedings have progressed to the point where the parties are prepared for trial. We conclude that the intensive

B. *Lack of any connection with or inter-
ference with the Bankruptcy case*

This issue was not addressed in the bank-
ruptcy court's May 15, 1992, Opinion, there-
fore, we will consider the Appellants' argu-
ments, and determine if there is cause to
lift the stay.[19]

The Appellants argue that the New Jer-
sey proceeding does not affect the adminis-
tration of the estate because 1) the nature
of the New Jersey litigation is to determine
the parties' rights and the validity of the
1972 and 1974 contracts, which is declarato-
ry in nature; 2) the claims against the
Debtor are contingent claims which were
pending before he filed his petition; 3) and
the continuation of the New Jersey trial
will help resolve the Bankruptcy case by
determining what property is to be included
in the Debtor's estate. Then, the bank-
ruptcy court can proceed to exercise its
jurisdiction over the property. Moreover,
any award of fees against the Debtor could
not be enforced without the proper pro-
ceedings in bankruptcy court. *See In re
White*, 851 F.2d at 173–174 (the court of
appeals affirmed the district and bankrupt-
cy courts lifting of the stay to allow a
divorce suit to continue in order to decide
what property belongs to whom); *See also
Unioil*, 54 B.R. at 195; and *Tucson Es-
tates*, 912 F.2d at 1169 (both these cases
allow the state court litigation to proceed
to determine the parties' liability while re-
serving judgement for the bankruptcy
court).

We are persuaded by Appellants' argu-
ment that a resolution of the New Jersey
proceedings would advance the settlement
of the Bankruptcy case without interfering
with it. If, for example, the decision came
down in favor of the Debtor, he would then
have available substantial funds with which
to satisfy his creditors. If he were to lose

in New Jersey then the Debtor would have
a declaration against him under the 1974
Amendment for attorney's fees—no small
sum—and a declaration that his inheritance
claims were unconvincing. Both of these
possible outcomes would promote the bank-
ruptcy proceeding because they would de-
termine if the Debtor would have additional
funds or an additional debt. Neither of
these proceedings would interfere with the
estate because they are declaratory in na-
ture and could not be acted upon without
the proper proceedings in bankruptcy
court.

The Appellants also contend that the
Debtor's petition is not sincere. They al-
lege, and the Debtor does not rebut, that
he has no dischargeable debts at present,
and that his wife, Liliana, has now pur-
chased almost all of the non-insider, non-
contingent claims against him. She has
also waived any right to repayment from
the estate. "Indeed, there was no legiti-
mate reason for this Debtor to file Bank-
ruptcy". Appellants Br., Oct. 28, 1992, at
8, Civ. No. 92–1796 (GG). It appears to be
common knowledge that the Debtor is not
bankrupt. Yet, the Debtor's true financial
worth has remained a mysteriously shroud-
ed fact.[20] Therefore, any interference with
the Bankruptcy proceeding by lifting the
stay would be irrelevant because the Debt-
or does not need the protection of the bank-
ruptcy court.

We are persuaded the Appellants have
presented prima facie evidence that the res-
olution of this case in New Jersey would
not interfere with the bankruptcy proceed-
ings. On the other hand, the Debtor has
failed to present any evidence to show that
the administration of his estate would be
affected.

Therefore, we find that the New Jersey
proceeding does not bear a significant rela-

proceedings in New Jersey are equivalent to a
trial. *See supra* text accompanying note 15.

**19.** Mot. for Relief from Stay, Nov. 6, 1990; R.
on Appeal Vol. I at 21–23.

**20.** At the hearing on Appeal of October 2, 1992,
I asked Appellants why this case was in bank-
ruptcy court. Appellants responded that the

Debtor's were generally trying to avoid the is-
sues before the New Jersey court. The Debtor
rebutted with the bankruptcy court's finding of
no misconduct, which was based upon Charles'
desire to litigate in Puerto Rico. The Debtor's
reply did little to reassure the court, or other-
wise clear the mists of doubt and suspicion
surrounding his bankruptcy petition.

tionship to the purpose of the automatic stay, and that lifting the stay would not interfere with the bankruptcy proceedings or the Debtor's estate.

## C. *Balance of hurt*

This is the last *Curtis* factor that applies to this case. The bankruptcy court found in its February 8, 1991, Opinion and Order that Goya and the Beneficiaries of the trust were not prejudiced in any way greater by the automatic stay because the parties were already stayed by Judge Leseman's Order in New Jersey Probate court.[21] Additionally, the bankruptcy court did not accept Appellants' assertion that a "cloud" over the stock ownership of Goya was a prejudice to them. The bankruptcy court also found that continuing the stay would not affect the corporation's ordinary business, nor will it lessen the time it will take to finally resolve the remaining issues.[22]

As to the latter finding, we can understand how the court arrived at this conclusion given its premise that allowing the New Jersey court to continue will not advance the resolution of this matter. However, in our discussion above we disposed of this premise. We find there is prejudice to the Appellants because without the stay they could return sooner to New Jersey and resolve the remaining issues. In fact, this is why Judge Leseman imposed his stay. In his Order of December 7, 1987, Judge Leseman instructed the parties that the trust is to be left intact until the challenges to it are resolved.[23] Therefore, until the stay is lifted the New Jersey court cannot continue and decide the issues presented to it.

The bankruptcy court acknowledged that Appellants were prejudiced by the stay, but it found that lifting the stay would not alleviate the prejudice. Specifically, the bankruptcy court assumed that Appellants—GOYA—could continue with their

business as usual. This inference misses the point Appellants were making. Appellants would no doubt accept that GOYA can continue on its business as usual—manufacturing and preparing hispanic foods and condiments. Their argument is that the "cloud" over the ownership is prejudicial. Unless this assertion is clearly spurious, it must be weighed against the Debtor's evidence of prejudice. An elementary deduction from an understanding of corporations would lead one to the conclusion that a "cloud" over the stock ownership of any business can be a problem. Therefore, the suspension of the proceedings in New Jersey prejudices the Appellants' business. We do not need to determine to what extent the Appellants are actually prejudiced, instead we will consider the Debtor's prejudice and weigh them against each other.

In Debtor's brief opposing the lifting of the stay on Appeal, the Debtor argued he suffered the following prejudice: 1) It would be too difficult and costly for him to defend himself against Goya in three different forums (he mentions he could spend the rest of his life in the courts; maybe he meant that he intended to litigate the inheritance for the rest of his life) and; 2) the Trustee would be unable to attend the proceedings in New Jersey because he has a law practice in Puerto Rico.[24] The bankruptcy court addresses the latter argument, and finds that for this reason the "continuance of suits in New Jersey is neither convenient nor economical".[25] We assume there was evidence to support these findings, however, this evidence was not mentioned in the bankruptcy court's Opinion and Order.

We understand it would be expensive for the Debtor to litigate in New Jersey, and Puerto Rico. Nevertheless, it was the Debtor who challenged the trust, and thus

---

**21.** *See* R. on Appeal, Vol. II, Ex. 7 & 8.

**22.** Op. and Order Feb. 8, 1991, at 11, 11. 6–11.

**23.** Judge Leseman Oral Op. Superior Court of N.J. at 9, 11. 8–11; R. on Appeal, Vol. II, Ex. 7 & 8.

**24.** Debtor's Br. October 28, 1992, Civil No. 92–1796.

**25.** Op. & Order May 15, 1992, at 18, 11. 8–9.

initiated this series of litigations in the Puerto Rico Superior court, the Puerto Rico bankruptcy court and the New Jersey Superior court.[26] He has demonstrated no problems hiring numerous lawyers and law firms for all of his suits. Any prejudice from these circumstances is self-inflicted. It is the Judicial system and its scarce resources that is most prejudiced by the Debtor's suspect claims aimed at avenging his ouster from the family's businesses.

In conclusion, we find the Appellants are suffering a greater harm than the Debtor as a result of the stay, and thus the balance tips in Appellants' favor to lift the stay.

### D. *Misconduct of the Debtor*

"Although, there is no precise test for determining bad faith, courts have recognized factors which show an 'intent to abuse the judicial process'...." *Dixie Broadcasting, Inc.*, 871 F.2d at 1027, *quoting In re Natural Land, Corp.*, 825 F.2d 296, 298 (11th Cir.1987). For example, courts have considered the timing of the filing of petition, *Natural Land* at 298; "whether the debtor is 'financially distressed'," *In re Waldron*, 785 F.2d 936, 939 (11th Cir.1986); or whether the debtor was trying to circumvent the non-bankruptcy litigation and avoid an unfavorable state court's judgment. *Laventhol & Horwath*, 139 B.R. at 117.

To illustrate, in *Laventhol & Horwath*, the court found it an improper manipulation of the federal judicial system for the debtor to file bankruptcy in New York, after a four year trial in a North Carolina District Court. The court suspected the debtor was removing himself because of an unfavorable decision from the Judge. *Id.*

In *Hohol*, 141 B.R. at 299, the court lifted the stay because it found that the debtor filed bankruptcy when the proceedings in state court were going against him. In *Tucson Estates*, 912 F.2d at 1169, the debtor delayed filing bankruptcy until the sixth year of litigation in state court when a summary judgment came down against him. The court commented that the debtor's action "suggests that the filing's purpose was to avoid an unfavorable state court judgment." *Id.*

Finally, in *Dixie Broadcasting, Inc.*, 871 F.2d at 1026–27, the 11th Circuit Court of Appeals affirmed the bankruptcy court's lifting of the stay because the debtor filed bankruptcy in bad faith. The debtor, who was in good financial health, filed a bankruptcy petition during the lunch recess of a court ordered settlement negotiation. *Id.*

The Debtor, Charles Unanue, filed his petition for bankruptcy on August 29, 1990; about one week before the last trial day, scheduled for September 7, 1990, before Judge Kole. The Appellants claim that the Debtor, who was present in New Jersey during the trial until September 7, neither objected to the proceedings nor did he inform the Appellants of his Bankruptcy petition. These circumstances closely resemble those cases that found the Debtor had filed bankruptcy in bad faith to avoid the effect of an impending decision. The bankruptcy court, however, found that the Debtor's motions for removal from the New Jersey Superior court were merely his efforts to have his case heard in Puerto Rico.[27]

We can agree with the bankruptcy court that the Debtor was in a predicament, but we cannot agree it is the responsibility of

---

26. We understand that technically Appellants, Joseph and Frank Unanue as trustees of the trust, filed the declaratory action against the Debtor, on August 13, 1987, in the Probate part of the Superior Court of New Jersey. However, the Debtor was fully aware that the 1974 Amendment proscribed him from making any claims against don Prudencio's estate, and that his efforts to do so could, if he lost, subject him to liquidated damages. Therefore, we consider the Debtor to have "initiated" the litigation in New Jersey.

27. The Appellants informed the bankruptcy court in their brief of the Debtor's many attempts to remove the case to Puerto Rico. The Debtor tried to remove both to a district court in New Jersey and to this district court in Puerto Rico. He was sanctioned by both District Courts under F.R.C.P. 11, and a $16,011.15 sanction was assessed against him. (R. on Appeal Vol. I, Ex. 33A at 10, n. 7) *See Unanue–Casal v. Unanue–Casal*, 898 F.2d 839 (1st Cir.1990); *See also Unanue Casal v. Unanue Casal*, 132 F.R.D. 146 (D.C.N.J.1989).

102

the judicial system to accommodate him. Moreover, we cannot overlook the closeness to the end of trial in New Jersey that the debtor filed his bankruptcy petition; it has every appearance of being the sole result of the Debtor's or his attorney's perceptions that he was going to lose in New Jersey. We cannot turn our backs on this manipulation of the judicial system. There is also evidence that the Debtor's petition for bankruptcy is a sham, because he is not "financially distressed". *See* discussion *supra* part B. We are convinced the Debtor acted in bad faith when he filed for bankruptcy. Any other interpretation of the circumstances surrounding the Debtor's Bankruptcy petition was clearly erroneous.

## CONCLUSION

The Appellants presented an abundance of evidence, which was sufficient to find cause for the lifting of the stay. We reiterate that, because of the bankruptcy court's defective legal standard, we need not have reviewed the court's opinion under the clearly erroneous standard. Nevertheless, we find the bankruptcy court's conclusion, that the Appellants did not meet their burden of proof for cause, was clearly erroneous. Consequently, the bankruptcy court did not exercise its discretion reasonably in guiding the inquiry on the question of cause, and when it subsequently denied relief from the stay once cause was established.

Therefore, the bankruptcy court's decision not to lift the stay on the New Jersey proceedings is hereby **REVERSED.** The stay is hereby lifted and the litigation pending in New Jersey will proceed. Judgment will be issued accordingly.

**SO ORDERED.**