# United States Court of Appeals
## For the First Circuit

Nos. 18-2248
     18-2249

IN RE DONALD C. KUPPERSTEIN,

Debtor.

DONALD C. KUPPERSTEIN,

Appellant,

v.

IRENE B. SCHALL, Personal Representative of the Estate of Fred
    Kuhn; EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES,

Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Torruella, Thompson, and Barron,
Circuit Judges.

David G. Baker for appellant.
Roger Stanford, with whom Irene B. Schall and Moses, Smith,
Markey & Walsh were on brief, for appellee Irene B. Schall.
Paul T. O'Neill, Assistant General Counsel, for appellee
Executive Office of Health and Human Services.

November 15, 2019

**THOMPSON**, <u>Circuit Judge</u>.

## PREFACE

Five years ago, Thomas Sheedy bought Carol Thibodeau's house for a pittance and gave it to appellant Donald Kupperstein, an attorney licensed in Massachusetts. The state court reversed the sale, but Kupperstein kept collecting rent. These appeals are the latest round in his long fight to keep the money, which he now owes the Commonwealth of Massachusetts (we'll explain why). So far, he's defied seven state court orders, four arrest warrants, and a mountain of contempt sanctions. He filed bankruptcy to ward them off — hoping the Bankruptcy Code's "automatic stay" would stop the state court from enforcing its orders. But the bankruptcy court lifted the stay, so Kupperstein skedaddled while his lawyer appealed. Fed up, Massachusetts asked the judge to dismiss the appeal based on the "fugitive disentitlement doctrine" — the rule that a fugitive (usually a criminal one) forfeits the right to appeal the judgment (usually a conviction) he's fleeing. The district court agreed and dismissed the appeal.

Kupperstein's serial misconduct and contempt for the state courts trouble us, too. And his victims argue (fairly) that the Bankruptcy Code doesn't shield him from his comeuppance. But the district court never reached that issue; it booted the appeal prematurely. Because we find this early dismissal was an abuse of discretion, we reverse and remand for a decision on the merits.

## HOW WE GOT HERE

### The House

When her father died, Carol Thibodeau (Fred Kuhn's only child) was left with his only significant asset: a house at 346 Reservoir Street in Norton, Massachusetts. Unfortunately for Thibodeau, Kuhn's estate also owed approximately $191,747 to the Massachusetts Office of Health and Human Services, more commonly known as "MassHealth."[1] (For the uninitiated, MassHealth can recoup paid benefits from a recipient's estate after he dies. See Mass. Gen. Laws ch. 118E, §§ 31, 32). The state had long ago placed a lien on Kuhn's house to secure the debt. After Kuhn passed, MassHealth planned to have Thibodeau, who was also the Estate's personal representative, sell the house (worth around $168,000, per the probate court) to pay off the lien. It filed a petition in probate court to make that happen.

Enter Kupperstein and his associate, Thomas Sheedy — who had other plans. In November 2014, they showed up at Thibodeau's home with a sales pitch. First, they had bad news: the Estate owed the Town of Norton $3,379.13 in unpaid real estate taxes. Not to worry – they could help. All she had to do was hand over the house to Sheedy, who would take care of the taxes. Thibodeau promptly agreed. And so, without notifying the Estate's attorney

---

[1] "Personal representative" is Massachusetts' term for an administrator or executor. See Mass. Gen. Laws ch. 190B, § 1-201.

(Austin McHoul), Kupperstein notarized a deed that conveyed the property to Sheedy (as trustee for the "Reservoir Street Realty Trust") in exchange for "less than $100" and "tax redemption of $3,379.13."[2]

Unbeknownst to Thibodeau, the deal was against the law (the probate court would later hold): she could not sell the house before paying MassHealth's six-figure claim. When McHoul discovered what happened, he (in the probate court's words) "requested Mr. Kupperstein and Mr. Sheedy return the property to the Estate of Mr. Kuhn due to the improper nature of the transaction." The duo refused.

**The State Court Cases**

So began the five-year campaign to wrest back control of the house from Sheedy and Kupperstein, who dug in their heels. When McHoul told MassHealth of the house swap, MassHealth sued the pair in Massachusetts state court. After a year of legal wrangling,[3] the probate court voided the transfer to Sheedy,

---

[2] The appellees tell us that Kupperstein notarized the deed in Rhode Island, though he wasn't licensed to do so there, and falsely attested he'd done it in Bristol to make it seem legit.

[3] For those willing to walk the procedural maze, MassHealth first sued Thibodeau, Sheedy, and Kupperstein in Suffolk Superior Court, which dismissed MassHealth's claim for fraud (because the complaint alleged misrepresentations to Thibodeau, not MassHealth), and left the sale intact (finding that Thibodeau, who inherited the house, had the power to sell it in her individual capacity).

- 4 -

restored the property to the Kuhn estate, and ordered its sale to pay MassHealth. The court also ordered that Kupperstein and Sheedy account for "any and all" rents they'd collected from the property and hand them over to MassHealth.[4]

Easier said than done, it'd turn out. Within a few months of the probate court's decision (by December 2016), Sheedy had leased the house for around $1,800 a month. Mid-way through 2017, Sheedy passed off his claimed ownership to Kupperstein (as the trustee and beneficiary of the "Norton Realty Trust"), who kept collecting rent. All in all, Sheedy and Kupperstein raked in at least $54,750 from tenants. Despite the district court's order, they gave none of it to MassHealth or the Estate.

And so, on August 4, 2017, the probate court held the two in contempt. To no effect. Less than a month later, Kupperstein had installed two new tenants, whose lease dubbed Kupperstein's trust "the fee owner of [the] property at 346 Reservoir Street" and charged them the same $1,800 monthly. In

---

However, the judge also held that MassHealth's lien was still valid and urged the agency to ask the probate court to force the property's sale to satisfy the debt. MassHealth took the court's cue and filed its petition. In granting it, the probate court voided the transfer to Sheedy, saying it violated MassHealth regulations. The superior court later resolved any conflict between its decision and that of the probate court by adopting the probate court's conclusion and entering judgment for MassHealth against Kupperstein.

[4] Kupperstein did not appeal that order.

answer, the probate court issued a decree making pellucid that "[n]either Thomas E. Sheedy nor Donald C. Kupperstein . . . shall execute or record any further documents concerning 346 Reservoir Street" and that any documents they executed were "without force or effect." Moreover, neither man, nor "anyone acting . . . at their direction(s)," was to "enter the property for any reason without further order."

Unsatisfied with how the probate proceedings were going, Kupperstein sought a second opinion. He sued Thibodeau in the Massachusetts Land Court, asking it to declare him the house's rightful owner. In his filings, Kupperstein forgot to mention the probate court's decisions. Playing legal whack-a-mole, MassHealth intervened to educate the land court, which dismissed Kupperstein's complaint as "wholly insubstantial and frivolous . . . because he completely ignored" that the probate court had already "fully and finally adjudicated the title to the Property" against him. The court concluded that Kupperstein "brought [the case] in bad faith" and awarded MassHealth and Thibodeau over $9,000 in attorneys' fees.

The next day (December 22, 2017), the probate court doubled down, finding Sheedy and Kupperstein in contempt again and ordering them (again) to cough up the rent they'd collected. It also ordered them to "surrender all keys and any other means of access" to the house, along with "any documents, leases or other

instruments," to the Estate by the close of business. And it threatened to jail them for 30 days unless they paid MassHealth $5,400. In response, Kupperstein and Sheedy surrendered roughly $3,000 in checks, but not the keys and leases. Losing patience (and without being asked), the court directed the pair to explain why it shouldn't impose the 30-day jail sentence. It scheduled the hearing for January 12, 2018.

On January 11, 2018 — the day before the hearing — Kupperstein filed this case in the United States Bankruptcy Court for the District of Massachusetts, listing the Kuhn house as his own asset worth $350,000.[5]

Some background: a bankruptcy filing triggers an automatic stay that halts lawsuits against the debtor in other courts until a federal court ends the case or lifts the stay. See In re Soares, 107 F.3d 969, 975 (1st Cir. 1997)(citing 11 U.S.C. § 362(a)). The idea is to stop creditors from scrambling for "the lion's share of the debtor's assets" (so they can be divvied-up more fairly) and to give the debtor breathing room to manage his debts (so he can get a fresh start). Id. at 975, 977. At his hearing the next day, Kupperstein claimed that the automatic stay tied the state court's hands, so it could not sanction him for

---

[5] To mitigate things, Kupperstein did note that he owned the house "subject to Probate Court rescission Order and Execution against prior owner."

failing to produce the rents and keys. The probate court didn't see it that way. It held that Kupperstein had violated its orders a fourth time, locked him up in a holding cell for the rest of the day, then gave him another chance to give up the house keys (though Kupperstein claimed he didn't have them). At the next court date (in March 2018), after retrying the automatic stay argument (unsuccessfully), Kupperstein pulled $5,400 cash from his pocket to purge the contempt. He also produced a set of keys.

Then Kupperstein went AWOL. The court held him in contempt twice more for snubbing his three next court dates as well as the court's previous orders. To sum up, the court wrote, in violation of its orders, Kupperstein and Sheedy had: swapped and leased the house, installed new tenants, changed the locks, trespassed, listed the property as a personal asset on Kupperstein's bankruptcy petition, and withheld $54,750 in rent. The court ordered Kupperstein and Sheedy to pay MassHealth the outstanding rents, plus (as sanctions) $10,485 in attorneys' fees and the $70,289.65 statutory interest on MassHealth's unpaid Medicaid claim.[6] It also warned they'd be arrested and jailed for 30 days unless they worked with MassHealth to agree on a payment

---

[6] Also, in November 2018, the superior court entered judgment ordering Kupperstein to pay all those amounts, plus $6,330 costs and fees already awarded in the land court case and $575,240.37 (three times the MassHealth claim of $191,746.79), with interest, to MassHealth.

plan. To date, Kupperstein has still not complied with those orders, and the probate court has issued four warrants for his arrest. Despite several attempts to locate and arrest him — once at his last known address — he's remained at large. During one attempt, the sheriff reported that Kupperstein's house appeared "closed up" and "abandoned" with the furniture covered in cloths.

## This Case

Meanwhile, the Estate (through Appellee Irene Schall, a lawyer who replaced Thibodeau as its representative) and MassHealth petitioned the bankruptcy court to grant them relief from the automatic stay so the state court actions could proceed.[7] Kupperstein's counsel shot back with a motion to hold *MassHealth* in contempt, arguing that by asking the probate court to hold Kupperstein in contempt and litigating other motions in that court after the bankruptcy filing, the agency violated the automatic stay. While the motions were pending, the bankruptcy court granted Schall partial relief from the stay to (finally) sell the house, which she did.

The bankruptcy court later denied Kupperstein's motion for contempt and granted MassHealth relief from the stay. It reasoned that the probate court's contempt proceedings were exempt

---

[7] Schall and MassHealth also filed adversary proceedings arguing that the bankruptcy court should not discharge the debts Kupperstein owes them, and should dismiss his bankruptcy petition outright. Those proceedings are still pending.

- 9 -

from the automatic stay under 11 U.S.C. 362(b)(4) because they aimed "to enforce [a] governmental unit's . . . police and regulatory power," citing In re Dingley, 852 F.3d 1143, 1146 (9th Cir. 2017) and Alpern v. Lieb, 11 F.3d 689, 690 (7th Cir. 1993). As a result, on August 13, 2018, the bankruptcy court ordered that all three state court actions (in superior court, land court, and probate court) could proceed to collect "any restitution and sanction amounts," including attorneys' fees, from Kupperstein.[8] Kupperstein appealed both rulings (the one granting relief from the automatic stay and the other refusing to hold MassHealth in contempt for violating it) to the district court. He asked the bankruptcy and district courts to keep the stay in place pending his appeal, which both those courts denied.[9] He then petitioned

---

[8] The court caveated, though, that MassHealth could not attempt to enforce "any judgment with respect to the $191,741.79 MassHealth reimbursement claim or attempt to collect from Kupperstein all or any part thereof."

[9] Kupperstein also asks us to review the district court's September 6, 2018 decision declining to keep the automatic stay in place while it considered his appeal. However, his notice of appeal mentioned only the "orders entered . . . on December 17, 2018" (*i.e.*, the orders dismissing his appeal). "Even though notices of appeal are to be liberally construed, if the appellant chooses to designate specific determinations in [her] notice of appeal — rather than simply appealing from the entire judgment — only the specified issues may be raised on the appeal." Santos-Santos v. Torres-Centeno, 842 F.3d 163, 169 (1st Cir. 2016) (citations and quotation marks omitted). Kupperstein does not explain why we should make an exception to that rule here — waiving the argument — so we find ourselves without jurisdiction to review the decision denying him a stay pending his district court appeal.

- 10 -

us to impose our own stay.  We construed that petition as for writ of mandamus and denied it.

In the meantime, Kupperstein missed his September 2018 contempt hearing, resulting in another arrest warrant (for his seventh contempt, for those counting).  That was the last straw for MassHealth and the Estate. They moved the district court to dismiss both appeals based on the fugitive disentitlement doctrine, which allows courts to dismiss the appeal "of a fugitive who is still on the lam."  Walsh v. Walsh, 221 F.3d 204, 214 (1st Cir. 2000).  MassHealth (joined by the Estate) argued that by "flouting" the probate court's orders and evading arrest, Kupperstein became a "fugitive from justice."  The agency did not argue that Kupperstein violated any orders in this federal case. Nonetheless, in its view, Kupperstein's appeals were just his latest ploy in his "contumacious" campaign "to frustrate and delay" the state court's orders.  As such (it urged) the appeal should be dismissed under our analysis in Goya Foods, Inc. v. Unanue-Casal, 275 F.3d 124, 128 (1st Cir. 2001) (where we tossed two fugitives' appeals from orders executing judgment and holding them in contempt).

---

See United States v. Salimonu, 182 F.3d 63, 74 n.10 (1st Cir. 1999) (holding that parties waive arguments they fail to develop).

Reserving ruling, the district court promptly directed MassHealth to report whether Kupperstein showed at his next (December 14, 2018) probate court hearing to purge the contempt. After Kupperstein missed that hearing, too (triggering another arrest warrant), the district court dismissed his appeals "for the reasons stated in [MassHealth's] motion."

Kupperstein appealed to us.

### THE FUGITIVE DISMISSAL RULE: A PRIMER

Federal courts have the discretion to dismiss an appeal without hearing the merits "if the party seeking relief is a fugitive while the matter is pending." Degen v. United States, 517 U.S. 820, 824 (1996). We've done it "even where the appeal [was] taken from a civil judgment." Goya, 275 F.3d at 128–29 (citing Walsh, 221 F.3d at 214). This so-called "fugitive disentitlement doctrine"[10] is one of many tools — like the power to dismiss a case for failure to prosecute, to punish contempt of court, or to vacate judgments gained by fraud — that spring from federal courts' "inherent authority to protect their proceedings and judgments." Degen, 517 U.S. at 823 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43–46 (1991) (reviewing federal courts' "implied powers" to "impose . . . submission to their lawful mandates" and

---

[10] It got the name from Molinaro v. New Jersey, where the Supreme Court held that a fugitive's escape "disentitle[d]" him to appeal his criminal conviction. 396 U.S. 365, 365–66 (1970).

- 12 -

sanction "conduct which abuses the judicial process")). It targets litigants who try to "reap the benefit of the judicial process without subjecting [themselves] to an adverse determination." United States v. Pole No. 3172, 852 F.2d 636, 643 (1st Cir. 1988).

However, discretionary dismissal is a "severe sanction" that cuts hard against our strong preference to decide disputes on their merits. Id. at 642 (internal quotations omitted); see also Degen, 517 U.S. at 828 (warning that respect for courts "is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits"). And "principles of deference counsel restraint" when using an inherent power forged by unelected judges. Degen, 517 U.S. at 823. The fugitive dismissal rule, like any such power, is "limited by the necessity giving rise to its exercise." Id. at 829. So courts may wield it only when needed to serve its purposes: to ensure the "judgment on review" can be enforced, avoid delay or prejudice to the other side, protect the court's "dignity," and deter flight. Id. at 824-25; see also Walsh, 221 F.3d at 215 (reiterating that "the sanction . . . [of] dismissal" must be "necessary to effectuate the[se] concerns underlying the fugitive disentitlement doctrine" (internal quotation marks omitted)).

Given the stakes, we keep dignity and deterrence in mind ("[b]oth interests are substantial," Degen, 517 U.S. at 828), but focus on "the kind of practical considerations that inform the

- 13 -

decision whether to dismiss a suit with prejudice as a sanction for mistakes, omissions, or misconduct." Walsh, 221 F.3d at 215 (quoting Sarlund v. Anderson, 205 F.3d 973, 974 (7th Cir. 2000)); accord Goya, 275 F.3d at 129 (noting that the Court in Degen "focused attention on practical considerations particular to the case rather than abstract concerns about court dignity or future deterrence"). And so, at least in civil cases, the best reasons to threaten and impose dismissal are to (1) avoid rendering an unenforceable judgment and (2) prevent unfairness to the other party resulting from the appellant's fugitive status. Gao v. Gonzales, 481 F.3d 173, 177 (2d Cir. 2007).

All that said, we trust the district court to weigh these interests and determine what's "necessary" to serve them — within reason. As in any appeal from a discretionary dismissal imposed as a sanction, we'll reverse if the judge abused his discretion, but affirm if not. See Mastro v. Rigby, 764 F.3d 1090, 1096 & n.5 (9th Cir. 2014) (reviewing dismissal under fugitive disentitlement doctrine for abuse of discretion); Bano v. Union Carbide Corp., 273 F.3d 120, 125 (2d Cir. 2001) (same); see also Bachier-Ortiz v. Colon-Mendoza, 331 F.3d 193, 194 (1st Cir. 2003) (stating on appeal from a discretionary dismissal for lack of prosecution that we "review the district court's dismissal of a case as a sanction for abuse of discretion"); Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003)(reviewing for abuse of discretion the discretionary

dismissal of a case for failure to comply with court orders). Along the way, we review legal conclusions de novo (with no deference) and factual findings for clear error, Walsh, 221 F.3d at 214 — meaning we defer to the district judge's take on the facts unless our review of the whole record gives us "a strong, unyielding belief" that he made a mistake. In re O'Donnell, 728 F.3d 41, 45 (1st Cir. 2013) (internal quotation marks omitted). All-in-all, the abuse-of-discretion standard "is not appellant-friendly," and "a sanctioned litigant bears a weighty burden in attempting to show that an abuse occurred." Young, 330 F.3d at 81.

**OUR TAKE**

As we'll explain, Kupperstein meets that burden here. But first, we address his first two arguments — and in doing so, we'll tee up his third, which carries the day.

**A Fugitive**

First, Kupperstein is "bewilder[ed] at the suggestion that he is a fugitive." According to him, he's "not evading arrest"; when MassHealth filed its motions to dismiss, he was "at home in South Easton" Massachusetts. It's not his fault that "the sheriff cannot find him," he tells us. However, the district court had good reason to find that Kupperstein was "a fugitive who remains in hiding . . . actively evading apprehension by the Sheriff." Despite seven contempt orders and an outstanding arrest

- 15 -

warrant (which Kupperstein does not dispute he knew about), Kupperstein remained a no-show in the probate court. And so far as the sheriff could tell, he'd abandoned his house. Wherever he is, Kupperstein is hiding from arrest to shirk the probate court's sanctions. That makes him a fugitive. See Molinaro, 396 U.S. at 365-66 (holding bailed defendant became a fugitive because he "failed to surrender himself to state authorities" when required); United States v. Barnette, 129 F.3d 1179, 1184 (11th Cir. 1997)(ruling appellant became a fugitive "by hiding" from arrest warrant for contempt of court, even though it wasn't clear he'd left the jurisdiction); Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 282 (2d Cir. 1997) (appellants were fugitives when they disappeared after warrants issued for missing depositions and disobeying court orders).

## A Civil Case

Second, Kupperstein maintains that the fugitive dismissal rule only applies to fugitives from criminal prosecutions, while the probate case is a civil matter. Not so long ago, this swing would've connected. In 1992, we rejected an ask to toss an appeal based on the fugitive dismissal rule because the company-defendant defied the district court's preliminary injunction and contempt order; we cautioned that we'd only applied the doctrine to *criminal* fugitives, and we were "extremely reluctant to invoke [it] when [the] appellant ha[d] not committed any criminal act." United

- 16 -

Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1098–99 (1st Cir. 1992) (holding that the Scottish company's contempt did not forfeit its right to appeal based on its "good-faith challenges" to the U.S. district court's jurisdiction over it).

Nonetheless, we later extended the doctrine to dismiss the appeals of two civil contemnors who frustrated, then fled, the civil judgment and contempt order they appealed. Goya, 275 F.3d at 129. And we gave two examples of other circuits doing the same. Id. at 129 n.2 (citing Empire Blue Cross, 111 F.3d at 282 (holding "that we have discretion to dismiss the appeal of a civil litigant who becomes a fugitive to escape the effect of a civil judgment") and Barnette, 129 F.3d at 1186 (ditto)). We noted that the appellants' misconduct (they sold their shares in real estate securing the judgment and absconded with the money) was "extremely serious," their "flight gr[ew] directly out of [the plaintiff's] effort to enforce its judgment in the civil proceeding," and the "appeals [were] themselves little more than devices to frustrate and delay the enforcement" of that civil judgment. Id. at 129. So Kupperstein's bid to cabin the doctrine to criminal fugitives comes too late.

## The Rub

However, unlike in Goya, Kupperstein was a fugitive from the *state court*'s judgment, not the bankruptcy or district courts'

- 17 -

(whose orders he never disobeyed). So his third argument — that the district court could not dismiss his case to help enforce the state court's orders — cuts more ice. As noted earlier, a federal court's discretion to dismiss a fugitive's case flows from its "inherent power" to protect its *own* "proceedings and judgments" — not another court's. Degen, 517 U.S. at 823-24; see Ortega-Rodriguez v. United States, 507 U.S. 234, 250 (1993)(rejecting "the faulty premise that any act of judicial defiance, whether or not it affects" the appellate court's "process, is punishable by appellate dismissal"); Bano, 273 F.3d at 125-26 (observing that a "court will ordinarily employ [the doctrine] only to ensure the enforceability of *its* decisions; to discourage flouting *its* process . . . or to avoid prejudice to the other side affecting litigation that is or may be before *it*"). But the district court dismissed Kupperstein's appeal because he failed to show in the Bristol Probate Court and made *that* court's judgment uncollectable.[11] And that's the rub.

The Supreme Court has twice rebuffed courts for dismissing one case to punish flight from another, noting that the escape wouldn't frustrate the dismissing court's judgment or

---

[11] Appellees' brief suggests that Kupperstein is flouting "Bankruptcy Court Orders," but doesn't identify any bankruptcy court order Kupperstein failed to obey. Anyway, before the district court, MassHealth only argued (and the district court only found) that Kupperstein had frustrated the orders of "the Bristol Probate Court."

impact its process. In Ortega-Rodriguez, the Eleventh Circuit had dismissed the appeal of a "former fugitive" who'd skipped town before sentencing but was recaptured pre-appeal. 507 U.S. at 242–44. The Court reversed. First, it said, there were no "enforceability concerns": the recaptured defendant could be forced to serve his sentence. Id. at 44. Second, the past escape (while it stalled sentencing) did not impact "the appellate process": it didn't slow the appeal, id. at 245, or handicap the government in its efforts to win the appeal or any retrial (which wasn't an option), id. at 249. And third, since the defendant returned before appeal — when "jurisdiction [ ] vest[s] in the appellate court" and "any deterrent to escape must flow from appellate consequences" — the district court had had "a wide range of penalties" to encourage surrender. Id. at 247. In a nutshell, the defendant had "flouted the authority of the District Court, not the Court of Appeals," so "it [was] the District Court that ha[d] the authority to defend its own dignity, by sanctioning an act of defiance that occurred solely within its domain." Id. at 246.

The Court drove home the point in Degen, whose namesake also fled a different proceeding. The district court, relying on the fugitive disentitlement doctrine, had entered judgment against Degen in his civil forfeiture case (allowing the government to commandeer properties he allegedly bought with drug money) because

he'd hightailed to Switzerland to avoid prosecution. Degen, 517 U.S. at 822. Again, the Court reversed. Sure, Degen's Euro trip waylaid any potential judgment in the criminal case. But it wouldn't "frustrat[e]" the government's efforts to prove "the merits of [its] forfeiture claims" (it'd win unless Degen showed up) and "the court's jurisdiction over the property [was] secure despite Degen's absence." Id. at 825. So as in Ortega-Rodriguez, "there [was] no danger the court in the forfeiture suit w[ould] waste its time rendering a judgment unenforceable in practice." Id. Moreover, the escape wouldn't make the (civil) case at hand unfair to the government; the district court had tools to keep Degen from using it to gain an unfair advantage in the stalled prosecution, and if Degen's absence hampered the civil case (e.g., if he missed a deposition), the district court could hit him with "the same sanctions" it'd use on "any other" litigant who failed to cooperate in a civil case (e.g., use the civil rules to charge him fees, strike his pleadings, or order dismissal for snubbing orders in that (civil) case). Id. at 827.

Relying on Degen and Ortega-Rodriguez, several courts have rejected the use of dismissal to sanction litigants for dodging another court's orders when the snub didn't impact the case on appeal. Take Mastro, holding that the district court blundered when it dismissed a bankruptcy appeal based on the appellant's "disregard for the authority of a different court"

(she fled a related prosecution), since her absence would not frustrate the judgment against her in the case at hand. 764 F.3d at 1096 & n.5. Or Bano, where the Second Circuit held a district court could not prevent a company from defending itself in a U.S. lawsuit because the company refused to stand trial in India. 273 F.3d at 126–27. There was "no question about the enforceability of any judgment" the U.S. district court might render, and "no discernible prejudice" to the plaintiff in the U.S. litigation. Id. at 126–27. And the district court could only dismiss the case "to protect its *own* dignity, efficiency, and efficacy," not the Indian courts'. Id. at 127 (emphasis added). We could go on. See, e.g., Marran v. Marran, 376 F.3d 143, 148–49 (3d Cir. 2004) (mother's contempt of state court child custody order was an "affront [] to the dignity of the Pennsylvania courts, not to [the Third Circuit]" and "ha[d] no direct effect on the processing" of her related federal appeal); Daccarett-Ghia v. Comm'r, 70 F.3d 621, 626 (D.C. Cir. 1995) (claimant's flight from related prosecution "neither affect[ed] the [tax] court's ability to carry out its judicial business nor prejudice[d] the government as a litigant" in the tax case on appeal).

On the other hand, the appellees do not cite any post-Degen case in which a court approved the use of the fugitive dismissal power to protect another court's judgments or proceedings, or to sanction contempt for orders other than the

- 21 -

judgment on review.[12]  In Goya — as in Empire Blue Cross and

Barnette — the appellants evaded the same orders they appealed.

See Goya, 275 F.3d at 129 (stressing that "the appeal [was] from

actions and orders of the district court designed to enforce th[e]

very judgment" they evaded).  In Empire Blue Cross, the Second

Circuit emphasized that point: the appellants' disappearance

"[did] not affect some related matter; it impact[ed] the very case

on appeal." 111 F.3d at 282.  And the court limited its holding

accordingly: "a fugitive whose absence severely prejudices a

proceeding may forfeit the right to appeal an adverse judgment

entered *in that case*."  Id.  We stressed the same fact in Goya —

---

[12] Courts *have* applied a statute (the Civil Asset Forfeiture Reform Act of 2000), passed after Degen, permitting federal courts to disentitle fugitives in civil forfeiture cases, so long as the accused "evades the jurisdiction of the court in which the criminal case is pending against" them. P.L. 106-185, § 14(a), April 25, 2000, codified at 28 U.S.C. § 2466; see, e.g., Collazos v. United States, 368 F.3d 190, 198 (2d Cir. 2004).  Since this isn't a forfeiture case, we deal only with the district court's *inherent* (non-statutory) disentitlement power.

And although appellees don't mention it, we note that even after Degen, other circuits have blessed the doctrine's use against criminal defendants who seek review of their state indictments or convictions under habeas corpus and 42 U.S.C. § 1983. See, e.g., Sarlund, 205 F.3d at 974 (§ 1983 case); Bagwell v. Dretke, 376 F.3d 408, 414 (5th Cir. 2004)(habeas case); Parretti v. United States, 143 F.3d 508, 509 (9th Cir. 1998) (habeas case). Once upon a time, we applied the fugitive disentitlement doctrine in a similar case: to dismiss an AWOL soldier's appeal from the denial of his petition for habeas corpus. See U.S. ex rel. Bailey v. U.S. Commanding Officer, 496 F.2d 324, 326 (1st Cir. 1974).  He sought review of — and fled — military custody, not the order from which he directly appealed. Id.  Such cases may present issues distinct from a civil contemnor's bankruptcy appeal, and we need not address them here.

writing that "the appellants' flight [was] not from some *other* proceeding, as in Degen" — and good thing, we said; that would have "rais[ed] the specter" that we meant to use dismissal "to coerce appearance" before another court.  Goya, 275 F.3d at 129.

So that specter haunts us here.  In this case, dismissal didn't serve the original reason for the fugitive dismissal rule: to ensure that courts don't waste time affirming a judgment that can't be enforced against the absconder.  See Degen, 517 U.S. at 824 ("[S]o long as the party cannot be found, the judgment on review may be impossible to enforce."); Ortega-Rodriguez, 507 U.S. at 240 (citing Smith v. United States, 94 U.S. 97, 97 (1876) (dismissing fugitive's criminal appeal because he was not "where he [could] be made to respond to any judgment we may render")).  This was the courts' "main concern" in Barnette, 129 F.3d at 1183, and key to Empire Blue Cross, 111 F.3d at 282 and Goya, 275 F.3d at 129 (reasoning that the appellants' flight "prevents [the plaintiff] from discovery that might be used to . . . enforce its judgment"); see also Yousif v. Yousif, 61 Mass. App. Ct. 686, 689–90 (2004) (asking whether the fugitive's "status is connected to the judgment appealed from" and "impairs the enforceability of [that] judgment").  Here though, the district court (even if it affirmed, and the automatic stay remained lifted) could not have

ordered Kupperstein to pay the state court judgment.[13]  So there was no chance the district court would affirm an unenforceable order.

Moreover, though Kupperstein's resistance hobbled the probate case, it didn't undermine the district court's "proceedings [or] judgments," Degen, 517 U.S. at 823, or "affect[] the appellate process," Ortega-Rodriguez, 507 U.S. at 250; it didn't delay the appeal, skew it in Kupperstein's favor, or handicap the Estate's or MassHealth's bid to lift the stay (and keep it up).  In Goya, the appellants' flight (from an action in the U.S. district court to enforce a judgment against them) not only represented a "blatant defiance of explicit [U.S. district] court orders," but also "prevent[ed] [the plaintiff] from discovery that might be used to unearth the proceeds of the sale or otherwise enforce its judgment."  275 F.3d at 129; see also Empire Blue Cross, 111 F.3d at 282 (where the appellants "severely prejudice[d]" appellees because they "made themselves unavailable for service of process and post-trial depositions" and so "rendered the judgment unenforceable"); Sarlund, 205 F.3d at 975

_____

[13]  Though of course, the bankruptcy court could still determine that the probate court's judgment is non-dischargeable or that it should be paid from Kupperstein's nonexempt assets as part of the distribution of his bankruptcy estate.  See 11 U.S.C. §§ 523, 704(a)(1), 726.  We express no view on these matters, since the only orders on appeal to the district court were those lifting the automatic stay and refusing to hold MassHealth in contempt for allegedly violating it.

(defendant's absence "severely prejudice[d] . . . his adversaries" in his civil case because he wouldn't show for depositions or pay sanctions for his suit, which was frivolous). But Kupperstein appeared in the bankruptcy case when required and answered Schall's questions (in a court-ordered exam) about his financial condition, the original deal with Thibodeau, and Kupperstein's subsequent dealings with the house. So the appellees were able to develop the facts below. And they can win on appeal (if the merits be in their favor) whether or not Kupperstein shows up to watch.

True, Kupperstein's appeal seeks relief from the probate court's orders: he asked the district court to reinstate the stay and stop the probate court from enforcing them. But if Kupperstein gets that relief, it'll be because the Bankruptcy Code entitles him to it. Unlike in Goya, Kupperstein's merits argument — that his bankruptcy petition stayed the state court's efforts to collect the contempt sanctions — is a fair one. Cf. Goya, 275 F.3d at 129-30 (finding appellant's arguments were "clearly frivolous" because we'd already rejected them). Several judges in this circuit agree with him. See In re McKenna, 566 B.R. 286, 289 (Bankr. D.R.I. 2017) (holding "proceedings to enforce and collect monetary sanctions" are stayed); In re Birchall, No. 07-13232, 2007 WL 1992089, at *9 (Bankr. D.Mass. July 3, 2007)(holding that civil contempt proceedings are subject to the automatic stay). That a debtor hasn't paid his state-court debts outside the

bankruptcy process can't be the reason we decline to decide whether he's supposed to do so in the first place — lest we create a "fugitive" exception to the automatic stay without analyzing the statute. And though it may mean more wrangling for the appellees, the costs of litigating that reasonable dispute don't offset our *strong* preference for decision on the merits, either. See <u>Pole No. 3172</u>, 852 F.2d at 642.

Let's be clear: none of this excuses Kupperstein's misconduct, which has a long, harmful history. By the state courts' telling, he and Sheedy ripped off Thibodeau, executed two sham deeds (one of which he illegally notarized), then — spurning two years of court orders and arrest warrants — installed two rounds of tenants, milked over $50,000 in rents, and kept the money to this day. By the time he filed his appeal to the district court, Kupperstein's serial contempt of the state court had already drawn this dispute into a three-year battle to enforce the probate court's judgment.[14] The Estate lost funds that could've gone to Thibodeau (Kuhn's sole heir) and MassHealth but for Kupperstein's "repeated refusal to obey" the probate court's orders. And the probate Estate "cannot be closed and final distribution made" while

---

[14] Kupperstein's conduct is especially troubling because, as we noted up front, he's an attorney still licensed to practice in Massachusetts. Despite his various ethical breaches, chronicled in multiple state court decisions, we're told that this litigation has, for whatever reason, held up disciplinary action against him.

the state court's "sanction awards are outstanding." Without a doubt, Kupperstein's contemptuous behavior has caused the estate costs to mount. But unless the district court (or we) reinstate the automatic stay, it's the probate court's prerogative to decide how to enforce its own orders and punish disrespect for them. See Ortega-Rodriguez, 507 U.S. at 246-47. And "[w]hile [the] case is pending" before the state courts, continued "flight can be deterred with the threat of a wide range of penalties available" to them. Id. at 247. For example, the probate court could threaten and (after due process) impose criminal contempt. See Furtado v. Furtado, 380 Mass. 137, 141 (1980). Meanwhile, the federal courts must apply the bankruptcy laws Congress charged them to enforce.

And by the way, those laws give the bankruptcy courts other tools to fight abuse of *their* processes. For example, MassHealth already asked to lift the stay (and dismiss the case) for "cause," 11 U.S.C. § 362(d)(1) — saying Kupperstein filed in bad faith.[15] Should the district court decide that the automatic stay applies, the bankruptcy court (on any remand) can grant appellees whatever relief might be available to them under the Bankruptcy Code — including (if appropriate) exercising its discretion to lift the stay for "cause," see In re Fin. Oversight

---

[15] Among other things, MassHealth claims Kupperstein listed few unsecured creditors, filed this case the day before his show-cause hearing, and "has an open equity line on his home of $300,000 that is untouched and fully available."

& Mgmt. Bd. for Puerto Rico, No. 18-1463, 2019 WL 4667518, at *3 (1st Cir. Sept. 25, 2019) (citing 11 U.S.C. § 362(d)(1)); In re Unanue-Casal, 159 B.R. 90, 96, 101 (D.P.R. 1993), aff'd, 23 F.3d 395 (1st Cir. 1994), or dismissing Kupperstein's petition, see 11 U.S.C. § 707(a), (b)(1) (permitting dismissal "for cause" or if granting relief to certain debtors "would be an abuse" of Chapter 7). These other methods of protecting the courts and appellees against any abuse of the bankruptcy process by Kupperstein, should he prevail in his appeal, cinch our conclusion that the blunt sanction of disentitlement was unneeded to serve the doctrine's purposes in this case. See Degen, 517 U.S. at 827 (citing courts' "alternative means" of ensuring the fugitive could not use the civil litigation to unfairly one-up the government in the criminal case as a reason that disentitlement was unnecessary).

## In Sum

This is a frustrating case — for MassHealth, the beleaguered probate Estate, and most of all for Carol Thibodeau. The appellees won in state court but still haven't been able to collect their judgment. As the bankruptcy court found, the Code might clear a path for the state court to enforce its orders. But the district court's inherent power to protect its *own* proceedings is not implicated here. And so, we must *reverse* and *remand* for the district court to decide the merits of Kupperstein's appeals.